UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SALLIE ROGERS-LEE,

                Plaintiff,                        Case No. 2:14-cv-11415
                                                District Judge George Caram Steeh
v.                                        Magistrate Judge Anthony P. Patti

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

## RECOMMENDATION TO GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DE 13) AND TO DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DE 11)

**I.**      **RECOMMENDATION**: For the reasons that follow, it is

**RECOMMENDED** that the Court **GRANT** Defendant's motion for summary

judgment (DE 13), **DENY** Plaintiff's motion for summary judgment (DE 11), and

**AFFIRM** the Commissioner's decision.

**II.**      **REPORT**

      Plaintiff, Sallie Rogers-Lee, brings this action under 42 U.S.C. §§ 405(g)

and 1383(c)(3) for review of a final decision of the Commissioner of Social

Security ("Commissioner") denying her applications for social security disability

insurance benefits and supplemental security income. This matter is before the

United States Magistrate Judge for a Report and Recommendation on Plaintiff's

motion for summary judgment (DE 11), the Commissioner's memorandum in

opposition and cross motion for summary judgment (DE 13), and the

administrative record (DE 6).

### A.   Background

This action comes before the Court following a remand by the Appeals

Council.  Plaintiff protectively filed her applications for benefits on September 24,

2009, alleging that she has been disabled since November 20, 2008, at age 37.  (R.

at 219-225.)  Plaintiff's applications were denied and she sought a *de novo* hearing

before an Administrative Law Judge ("ALJ").  ALJ Joel G. Fina held a hearing on

November 30, 2010 and subsequently determined that Plaintiff was not disabled

within the meaning of the Social Security Act.  (R. at 88-129.)   On June 13, 2012,

the Appeals Council granted Plaintiff's request for review, and remanded the case

back to an ALJ for a reassessment of her RFC and consideration of treating

physician Annette DeSantis, M.D.' s opinion evidence.  (R. at 134-36.)

As a result, ALJ Patricia S. McKay held a second hearing for further

consideration on October 1, 2012.  (R. at 34-84.)  On October 25, 2012, ALJ

McKay conducted a *de novo* review and determined that Plaintiff was not disabled

within the meaning of the Social Security Act.  (R. at 19-28.)  On February 1,

2014, the Appeals Council denied Plaintiff's request for review.  (R. at 1-4.)  ALJ

McKay's decision became the Commissioner's final decision.  Plaintiff then timely commenced the instant action.

### B.    Plaintiff's Medical History

Plaintiff suffered a work related injury as a Certified Nursing Assistant ("CNA") on October 14, 2008.  She described the incident as one in which a 400-pound patient was transferring a bedside commode to the bed, began to fall, and grabbed Plaintiff to steady herself.  (R. at 360.)  After attempting to brace the patient so she did not hit the floor, Plaintiff began to have back and right lower extremity pain.  (Id.)  Although Plaintiff's medical record is extensive, her arguments relate to the ALJ's analysis of Physical Medicine and Rehabilitation physician Annette G. DeSantis, and I will focus on her treatment records and opinions when summarizing Plaintiff's medical history.

Plaintiff presented to Dr. DeSantis on November 18, 2008.  (R. at 360-363.) She reported that her symptoms were worse at bedtime, that she had difficulty sleeping, and that she remained working as a CNA, albeit on a restriction of lifting up to 20 pounds.  (R. at 360-61.)  Dr. DeSantis indicated that Plaintiff had an even and normal gait pattern, was able to walk on her toes and heels symmetrically, had a negative straight leg raise bilaterally, had full range of motion in her hip, and had intact strength in all muscle groups.  (R. at 361-62.)  Based on the "normal examination," Dr. DeSantis concluded that Plaintiff had some level of soft tissue

train and potential spondylolisthesis.  (R. at 363.)  On December 2, 2008, Dr.

DeSantis reported that Plaintiff underwent an MRI on November 26, 2008, which

showed evidence of Grade I anterior spondylolisthesis at L5 on S1 of 4

millimeters, associated with sclerotic appearing bilateral pars intra-articularis

defects.  (R. at 358.)  Dr. DeSantis indicated that Plaintiff should continue physical

therapy and stay off work.  (R. at 359.)  On October 14, 2008, Plaintiff indicated

that physical therapy had been helpful.  (R. at 356.)  Her physical examination was

stable with intact strength, intact sensations, and intact reflexes.  Dr. DeSantis

noted that Plaintiff should increase her home exercise program.  (Id.)

A February 3, 2009 x-ray of the pelvis was normal.  (R. at 334.)  Plaintiff

underwent an independent medical evaluation on behalf of the State Agency with

orthopedic surgeon Philip Mayer, M.D., on June 29, 2009.  (R. at 378-384.)  Dr.

Mayer found no objective confirmation of Plaintiff's symptoms of L5

radiculopathy in the lower extremity.  He indicated that there was evidence of

symptom exaggeration or embellishment.  (R. at 383.)

Plaintiff saw Dr. DeSantis almost monthly for the first nine months of 2009.

At the appointments, Dr. DeSantis generally found Plaintiff's physical examination

to be stable, with intact strength, negative straight leg raise tests or only mild

positives on the right, and intact neuromuscular examination.  (R. at 338, 345, 349,

352, 354.)  However, Dr. DeSantis indicated that Plaintiff continued to have an

increase in her complaints of pain over the course of her care.  (R. at 345.)

Although Dr. DeSantis opined in January 2009 that Plaintiff could not return to her

work as a CNA, by June 4 of that year, she revised her opinion and concluded that

Plaintiff could return to work subject to ten-pound lifting and minimal bending

restrictions and a sit/stand option.  (R. at 355.)  In July, Dr. DeSantis continued to

permit her patient to work under the same restrictions and continued physical

therapy for four weeks.  (R. at 341.)  At the September 24, 2009 appointment,

Plaintiff's functional limitations improved somewhat, and Dr. DeSantis restricted

Plaintiff to lifting up to fifteen pounds in a biomechanically safe fashion.  (R. at

338-39.)

Plaintiff did not see Dr. DeSantis again until May 27, 2010.  At that

appointment, Plaintiff reported more back pain and difficulty sleeping, but Dr.

DeSantis noted that her strength, sensation, and reflexes were unchanged and that

her lumbar spine condition appeared stable.  (R. at 627.)  On April 26, 2012,

Plaintiff had her last appointment in the record with Dr. DeSantis.  Plaintiff

reported continued pain and noted that there was no position that made her feel

more comfortable.  (R. at 697.)  Plaintiff noted that she was taking her medicine

daily but had not kept up on her exercise program.  On physical examination, Dr.

DeSantis found negative straight leg raising bilaterally, intact muscle strength, and

intact reflexes.  Dr. DeSantis reported her impression as right lumbar radiculitis

symptomology, and instructed her on exercises to do at home.  (R. at 697-98.)  She also noted that she did not want Plaintiff to continue taking medication for the rest of her life.  (R. at 698.)[1]

### C.   Hearing Testimony

#### 1.   Plaintiff's Testimony

At the October 1, 2012 administrative hearing, Plaintiff testified that she lived in a two-story house (with a basement), with two of her four children, aged sixteen and eight.  (R. at 40-41.)  Plaintiff was married at the time of the hearing, but testified that her husband left her and did not live in the house.  (R. at 50 and 60.)

Plaintiff completed high school and later became a certified nursing assistant ("CNA") in 1994.  (R. at 41-42 and 72-73.)  Plaintiff testified that she began working at Henry Ford Hospital in 1998.  (R. at 44.)  She started as a patient support partner, which involved cleaning rooms, helping patients, transporting patients, and handing out trays.  (R. at 44.)  She then renewed her CNA certification and worked as a CNA from 2000-2008.  (R. at 45.)  She left her position at Henry Ford after she was injured in November 2008.  (R. at 51.)

---

[1] Dr. Vallabhaneai noted that Plaintiff was not entirely compliant in taking her prescribed medications and, despite her complaint that Naprosyn made her sleepy, explained to her that it does not cause sedation.  (R. at 580-81.)

Her injury occurred when she helped a patient stand.  (R. at 52.)  According to Plaintiff, when the patient stood up and leaned against her bed, the bed rolled because it had been not been locked.  Plaintiff caught the patient and slid the patient down her own body to the ground, as she had been taught.  When she stood up, however, she heard a "snap" and knew something was wrong with her right leg.  (R. at 52.)  When she returned home that day, she could not raise her right arm and had to drag her right leg.  (R. at 53.)  Plaintiff testified that she received a worker's compensation settlement following her injury, but that she was not currently receiving unemployment benefits.  (R. at 49.)

Plaintiff compared her life before her 2008 injury to her life after.  Before her injury, she awoke at 5:00 a.m., got her kids ready for the day, and got to work by 6:45 a.m.  (R. at 51.)  After her injury, her children handle the cooking, laundry, and cleaning, and she tries to stay on one floor of her house.  (R. at 53 and 56.)  Her husband comes to her home every day to help with chores, such as cleaning, taking out the trash, and helping the kids with homework.  (R. at 54 and 61.)  She testified that she could take care of her own hygiene.  (R. at 56.)  Plaintiff indicated that she spends her day watching television, and sleeping off and on because her medications make her so drowsy.  (R. at 61.)  She testified that she goes shopping about once a month, but that it is difficult to walk and get out of the

7

car.  (R. at 56.)  Plaintiff testified that she does not have a driver's license, but that her husband, daughter, and sister drive her where she needs to go.  (R. at 50.)

Plaintiff underwent physical therapy for about two years after her injury, but testified that it did not help at all.  (R. at 55.)  She testified that she took Vicodin, Soma, and Motrin for the pain every day, but that the only side effect she experienced was "being sleepy."  (R. at 55.)  According to Plaintiff, if she did not take her medication, her pain was a 10/10, but on the medication it was only 8/10. (R. at 62-63.)  She indicated that the pain made her irritable, but that it was more manageable on the medication.  (R. at 63.)  However, according to Plaintiff, the medication made her sleepy and forgetful.  (R. at 70.)  She also used a cane for walking, but she preferred to always be with someone when she left the house. (R. at 58.)

Plaintiff testified that the pain in her right leg and back keeps her up at night, and the medicine makes her very tired during the day.  (R. at 59-60.)  Plaintiff indicated that, even after physical therapy and taking her medications, her right leg still hurts and she has difficulty walking.  (R. at 65.)  She described her lower-back pain as if someone "took a razor blade and split my back open and poured lemon juice down . . . ."  (R. at 66.)  She described her hip and leg pain as throbbing but consistent.  (R. at 66.)   In addition to her back pain, Plaintiff suffers from asthma and has been deaf in her left ear since birth.  (R. at 58-59.)

Plaintiff indicated that she could stand about five minutes without leaning on something, could stand for ten to fifteen minutes while leaning on something, and could walk less than half a block before it felt like her right leg was giving out.  (R. at 67-68.)  Plaintiff testified that she cannot lift a gallon of milk because the weight of it causes her to stumble.  (R. at 68-69.)  According to Plaintiff, the most comfortable position for her is lying down with her knees bent.  (R. at 69.)

## 2.   Vocational Expert Testimony

Scott Silver testified as the Vocational Expert ("VE") at the October 1, 2012 administrative hearing.  (R. at 72-83.)  The VE classified Plaintiff's past relevant work as: nurse assistant, with a specific vocational preparation ("SVP")[2] of 4, semi-skilled, at the medium exertional level; and orderly, with an SVP of 2, unskilled, at the heavy exertional level.  (R. at 74.)  The ALJ asked the VE to determine if a hypothetical person of Plaintiff's age, educational background, and work experience, with the ability to perform the full range of light exertional work, could perform her past relevant work with the following limitations:

> Really, this person needs to be limited to occasionally climbing stairs or ladders, crouching or crawling, kneeling, stooping, or bending.  She needs to – really she needs to have the flexibility to change positions

---

[2] "The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."  SSR 00-4P.

>while she's performing the work.  She needs what is called a sit-stand
>option.  And I want her to be able to change positions as she desires.

(R. at 74.)  Based on this hypothetical, the VE testified that the hypothetical

individual could not perform any of Plaintiff's past relevant work, but could

perform other jobs in the national and regional economy.  (R. at 74-75.)  The VE

identified two such positions at the light exertional level:  office helper, SVP of 2,

with 3,400 jobs in Michigan, 1,800 in the tri-county area (Wayne, Oakland, and

Macomb counties), and 88,000 nationally; and parking lot attendant, SVP of 2,

with 3,000 jobs in Michigan, 2,100 in the tri-county area, and 100,000 in the

nation.  (R. at 75.)  The VE clarified that, although the sit-stand option is not an

element of the Dictionary of Occupational Titles, he observed through the course

of his practice that these particular positions allow a sit-stand option.

     Next, the ALJ asked the VE if those positions would still be available if the

hypothetical individual were limited to lifting only fifteen pounds occasionally,

noting that the light exertional level calls for lifting twenty pounds occasionally.

The VE testified that the two jobs above would still be viable with a fifteen pound

weight limit, based on his experience in the labor market.  (R. at 76.)  The VE then

asked if a further limitation, of lifting only ten pounds, "which . . . puts her into a

*sedentary exertional* category," would affect the availability of office helper and

parking lot attendant.  Such a limitation would not eliminate the jobs mentioned,

since "the lifting issue is non-existent for parking attendants" and office helpers

"are not generally lifting more than 10 pounds at a time."  (R. at 76-77.) (emphasis added).

The ALJ asked the VE if the above mentioned jobs would expose they hypothetical individual to pulmonary irritants, such as dust, odors, or fumes.  (R. at 77-78.)  The VE testified that such exposure would occur only if the parking lot attendant position were performed outside a booth.  In addition, the VE clarified that neither position would expose the hypothetical individual to workplace hazards, such as dangerous moving machinery.  (R. at 78.)

The ALJ next explored whether the hypothetical individual could perform the office assistant and parking lot attendant positions if she required a cane or other assistive device to walk.  The VE admitted that such a limitation would affect the office assistant job because the individual may need to carry something with two hands, and could affect the parking lot attendant job if the individual is not able to take cash and ring the cash register with both hands.  (R. at 78.)  As a result, the ALJ asked if there were any other positions that the hypothetical individual could perform.  The VE identified three positions at the sedentary exertional level, with SVPs of 2: addresser, with 3,000 jobs in Michigan; order clerk, with 4,000 jobs in Michigan; and surveillance monitor, excluding homeland security and gaming institutions, with 1,500 jobs in Michigan.  (R. at 79.)  The VE testified,

however, that the order clerk and addresser positions did not have a sit-stand option and therefore would be eliminated by such a limitation.  (79-80.)

Finally, the ALJ asked the VE to consider whether any of the positions discussed required more than occasional contact with coworkers, supervisors, or the general public.  (R. at 80.)  The VE testified that the parking lot attendant position would require contact with the public, but the others could be performed. When asked whether the hypothetical individual may have a difficult time paying attention and may be off task for more than 20% of the day, the VE testified that such a requirement would be work preclusive.  The VE clarified that a person would need to be on-task 90% or more of the time in the named positions.  (R. at 81.)  In addition, he testified that if the hypothetical claimant offered Plaintiff's testimony, which was found fully credible, the hypothetical individual could not perform Plaintiff's past work or any other work.  (R. at 81-82.)  He specifically noted that Plaintiff's testimony "point[s] to somebody that's not functioning at the full level that would be pertinent to a work situation."  (R. at 82.)

## D.  THE ADMINISTRATIVE DECISION

On October 25, 2013, the ALJ issued her decision.  (R. at 19-28.)  At Step 1 of the sequential evaluation process,[3] the ALJ found that Plaintiff had not engaged

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin*

12

in substantially gainful activity since her alleged onset date of November 20, 2008.

(R. at 21.)

At Step 2, the ALJ found that Plaintiff had the following severe

impairments: degenerative disc disease of the lumbar spine with disc bulge/tear

and mild to moderate biforaminal stenosis, worse on right than left, with mild

impingement on exiting LS nerve root.  (R. at 21.)  She found that Plaintiff's

impairments of cellulitis of the breast, asthma, and left ear hearing loss were non-

severe.  (R. at 22.)

At Step 3, the ALJ found that Plaintiff did not have an impairment or

combination of impairments that met or medically equaled one of the listed

impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 22.)

---

*v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential
review considers and answers five questions:

1.  Is the claimant engaged in substantial gainful activity?
2.  Does the claimant suffer from one or more severe impairments?
3.  Do the claimant's severe impairments, alone or in combination, meet
    or equal the criteria of an impairment set forth in the Commissioner's
    Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.  Considering the claimant's residual functional capacity, can the
    claimant perform his or her past relevant work?
5.  Considering the claimant's age, education, past work experience, and
    residual functional capacity, can the claimant perform other work
    available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th
Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

Between Steps 3 and 4 of the sequential process, the ALJ evaluated

Plaintiff's residual functional capacity ("RFC")[4] and determined that Plaintiff had

the capacity to perform:

> light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except
> she can only occasionally climb stairs and ladders, crouch, crawl,
> kneel, stoop/bend and she needs to have the opportunity to alternate
> between sitting and standing while engaged in the work as she desires.

(R. at 22.)  Relying on the VE's testimony, the ALJ determined at Step 4 that

Plaintiff was unable to perform her past relevant work.  (R. at 26.)

At Step 5, the ALJ concluded that Plaintiff was capable of performing other

jobs that exist in significant numbers in the national economy.  (R. at 26-27.)  She

therefore concluded that Plaintiff was not disabled under the Social Security Act.

(R. at 28.)

### E.   STANDARD OF REVIEW

The District Court has jurisdiction to review the Commissioner's final

administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case

under the Social Security Act, the Court "must affirm the Commissioner's decision

if it 'is supported by substantial evidence and was made pursuant to proper legal

standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009)

---

[4] The claimant's "residual functional capacity" is an assessment of the most the
claimant can do in a work setting despite his or her physical or mental limitations.
20 C.F.R. §404.1545(a); *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th
Cir. 2002).

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant."). Furthermore, the claimant "has the ultimate burden to establish an entitlement to benefits by proving the existence of a disability." *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this

Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## F. ANALYSIS

Plaintiff brings three main statements of error. First, she asserts that the ALJ failed to accord adequate weight to the opinion of Plaintiff's treating physician, Dr. DeSantis, in two ways: 1) by improperly stating that Dr. DeSantis' opinion was consistent with the RFC; and 2) by failing to provide reasons for her rejection of that opinion. Second, Plaintiff challenges the ALJ's RFC assessment as devoid of support from a physician. Finally, she asserts that the ALJ erred by failing to consider the side effects from Plaintiff's medications on her ability to work. The Commissioner opposes Plaintiff's motion, asserting that she is entitled to a grant of

summary judgment because substantial evidence supports the ALJ's conclusions and any error is harmless. The Undersigned will consider each argument in turn.

### 1.     The ALJ Committed Harmless Error in Her Analysis of the Opinion of Plaintiff's Treating Physician, Dr. DeSantis

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 416.927(d). The regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2). "Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists." 20 CFR § 404.1527(e)(2)(i). The ALJ must, however, "consider findings and other opinions" of State Agency medical or psychological consultants. Id.

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ." 20 C.F.R. § 416.927(d)(2); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009). To qualify as a treating

source, the physician must have an "ongoing treatment relationship" with the

claimant.  20 C.F.R. § 404.1502.

If the ALJ does not afford controlling weight to a treating physician's

opinion, the ALJ must meet certain procedural requirements.  Specifically, if an

ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the
> treatment relationship and the frequency of examination, the nature
> and extent of the treatment relationship, supportability of the
> opinion, consistency of the opinion with the record as a whole, and
> the specialization of the treating source—in determining what
> weight to give the opinion.

*Wilson*, 378 F.3d at 544 (discussing 20 C.F.R. § 404.1527).  Furthermore, an ALJ

must "always give good reasons in [the ALJ's] notice of determination or decision

for the weight [the ALJ] give[s] [the claimant's] treating source's opinion."  20

C.F.R. § 416.927(d)(2).  Accordingly, the ALJ's reasoning "must be sufficiently

specific to make clear to any subsequent reviewers the weight the adjudicator gave

to the treating source's medical opinion and the reasons for that weight."  *Friend v.*

*Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *7 (6th Cir. 2010)

(internal quotation omitted).  The United States Court of Appeals for the Sixth

Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants
> understand the disposition of their cases," particularly in situations
> where a claimant knows that his physician has deemed him
> disabled and therefore "might be especially bewildered when told
> by an administrative bureaucracy that she is not, unless some

> reason for the agency's decision is supplied." *Snell v. Apfel*, 177
> F.3d 128, 134 (2d Cir.1999). The requirement also ensures that the
> ALJ applies the treating physician rule and permits meaningful
> review of the ALJ's application of the rule. *See Halloran v.
> Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45.

Here, the ALJ assigned "great weight" to Dr. DeSantis' opinion, because it was "consistent with the residual functional capacity herein." (R. at 25.) Defendant concedes that the ALJ erred in her statement that Dr. DeSantis' opinion was consistent with the RFC. Specifically, Dr. DeSantis initially limited Plaintiff to lifting up to ten pounds, then, in September 2009, restricted her to lifting no more than fifteen pounds. (R. at 25, 339, and 341.) The RFC, however, states that Plaintiff is capable of the full range of light work, which is defined as follows:

> Light work involves lifting *no more than 20 pounds at a time* with
> frequent lifting or carrying of objects weighing up to 10 pounds. Even
> though the weight lifted may be very little, a job is in this category
> when it requires a good deal of walking or standing, or when it
> involves sitting most of the time with some pushing and pulling of
> arm or leg controls. To be considered capable of performing a full or
> wide range of light work, you must have the ability to do substantially
> all of these activities.

20 C.F.R. § 404.1567(b) (emphasis added). In contrast, Dr. DeSantis' opinion is consistent with <u>sedentary work</u>, which involves lifting no more than ten pounds at a time. Id. at §404.1567(a). In addition, Plaintiff asserts that the ALJ failed to consider Dr. DeSantis' treatment notes, which indicate that Plaintiff's condition worsened during her treatment, and that her medications made her very sleepy.

19

The Commissioner counters that, although the ALJ erred in her statement that the RFC was consistent with Dr. DeSantis' opinion, such error was harmless. According to Defendant, the ALJ either "erred in her statement that the RFC finding was consistent with Dr. DeSantis' opinion or she rejected the ten- and fifteen-pound weight-lifting limitations," each of which is supported by substantial evidence. Specifically, Defendant points out that the VE testified that the positions of office helper and parking lot attendant would be available to a hypothetical individual capable of lifting no more than fifteen pounds. According to the VE, this testimony was based on his own experience in the labor market and not the DOT. (R. at 76.)

As a preliminary matter, the ALJ's reliance on the VE's testimony is appropriate "notwithstanding contrary conclusions in the DOT if the expert is found to be credible, and the question posed to the expert accurately reflects the claimant's physical and mental limitations." *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 847 (6th Cir. 2004) (internal quotations omitted). Accordingly, to the extent the ALJ relied on the VE's testimony that a fifteen or even a ten-pound weight limit would not be work preclusive, such reliance was not in error.

However, the ALJ did err by failing to provide a sufficiently specific reason for (possibly) discounting Dr. DeSantis' opinions. To be sure, the ALJ did consider some of the *Wilson* factors, such as the length of the treatment

20

relationship and frequency of visits (R. at 24-25), and Dr. DeSantis' note that she believed Plaintiff was overly restricting herself (R. at 24). However, it is unclear what weight the ALJ gave to Dr. DeSantis' opinion and the reasons for that weight. Specifically, the ALJ indicated that she gave "great weight" to the opinion because of its consistency with the RFC. However, as conceded by the Commissioner, Dr. DeSantis' opinion that Plaintiff could lift only up to fifteen pounds was *inconsistent* with the ALJ's conclusion that Plaintiff could perform the full range of light work. Accordingly, the ALJ failed to provide good reasons for discounting Dr. DeSantis' opinion, likely because she thought that the opinion was consistent with the RFC.

Nevertheless, an ALJ's failure to provide good reasons could be harmless error. First, harmless error might occur "if a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it . . . ." *Wilson*, 378 F. 3d at 547. That would not seem applicable here, where there is a good reason to rely on Dr. DeSantis' opinion and the ALJ, in large part, did so rely. Next, if the decision was "consistent with the opinion, it may be irrelevant that the ALJ did not give weight to the treating physician's opinion, and the failure to give reasons for not giving such weight is correspondingly irrelevant." *Id.* Finally, the potential for harmless error exists "where the Commissioner has met the goal of §

21

1527(d)(2)—the provision of the procedural safeguard of reasons—even if she has not complied with the terms of the regulation. *Id.*

Neither party argues that Dr. DeSantis' opinion was patently deficient. Instead, the Commissioner argues that, to the extent the ALJ erred, her error was harmless because according to the VE's testimony, there was still work in the national economy that a hypothetical individual with Plaintiff's limitations could perform, *even with as little as a ten pound weight restriction*, making the RFC consistent with the treating physician's opinion. (R. at 76-77.) I agree.

The Sixth Circuit has held that, even where an ALJ did not discuss the opinion of a treating physician, such an error was harmless where the hypothetical to the VE took the relevant limitations into consideration. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001); *see also Sias v. Sec'y of Health & Hum. Servs.*, 861 F.2d 475, 478 (6th Cir. 1988) (finding harmless error where the ALJ failed to include a limitation in the RFC, where the VE considered the limitation and testified that the claimant could perform work with or without the limitation). Here, as addressed above, the ALJ appropriately relied on the VE's testimony that an individual who was limited to lifting fifteen pounds at a time— consistent with Dr. DeSantis' opinion—could perform the positions of office assistant and parking lot attendant. Moreover, the VE testimony provided substantial evidence that Plaintiff could perform those jobs with *even greater*

22

restrictions.  (*See* R. at 76-77.)  Despite the ALJ's confusing opinion, a remand

would be a useless formality.  *See N.L.R.B. v. Wyman-Gordon Co.*, 394 U.S. 759,

766 n. 1 (1969) (declining to remand an agency action where it would be an "idle

and useless formality.")[5]  Accordingly, although the ALJ erred in this respect, the

error was harmless and does not warrant a remand.

## 2.    Substantial Evidence Supports Plaintiff's RFC

Plaintiff's RFC is "the most [he or she] can still do despite the physical and

mental limitations resulting from [his or] her impairments."  *Poe v. Comm'r of*

*Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); s*ee also* 20 C.F.R. §§

404.1545(a), 416.945(a).  The determination of Plaintiff's RFC is an issue reserved

to the Commissioner and must be supported by substantial evidence.  20 C.F.R. §§

404.1527(3), 416.927(e).  "'ALJs must not succumb to the temptation to play

doctor and make their own independent medical findings.'"  *Simpson v. Comm'r of*

*Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98

F.3d 966, 970 (7th Cir. 1996)).

Pursuant to Social Security Rule 96-8p, the RFC assessment must include:

> [A] narrative discussion describing how the evidence supports
> each conclusion, citing specific medical facts (e.g., laboratory

---

[5] In fact, notwithstanding the ALJ's giving Dr. DeSantis' opinion "great weight,"
the hypotheticals which were given to the VE suggest that "controlling weight,"
was in fact given. The Treating Physician's Rule was therefore not effectively
violated, and the ALJ certainly did not "reject" those opinions, contrary to
Plaintiff's characterization.  (*See* DE 11 at iv.)

findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96-8-, 1996 WL 374184, at *6-7. "Although SSR 96–8p requires a 'function-by-function evaluation' to determine a claimant's RFC, case law does not require the ALJ to discuss those capacities for which no limitation is alleged." *Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547 (6th Cir. 2002). Instead, the ALJ '"need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record."' *Id.* (quoting *Bencivengo v. Comm'r of Soc. Sec.,* No. 00–1995, 251 F.3d 153, slip op. at 5 (3d Cir. Dec. 19, 2000).

Plaintiff asserts that the ALJ erred by "playing doctor" because the record was devoid of any medical assessment concerning Plaintiff's RFC.[6] Plaintiff notes that the ALJ gave "no weight" to the only RFC assessment in the record because the document was not signed by the State Agency reviewer. Defendant counters

---

[6] Plaintiff specifically refers to her "mental RFC," but, like the Commissioner, the Undersigned will consider this a scrivener's error, as Plaintiff's only alleged impairments were physical.

that the RFC was supported by substantial evidence and largely based on the limitations opined by Dr. DeSantis.

Defendant's argument is persuasive. First, although the ALJ did reject the unsigned RFC assessment of the State Agency reviewing physician, that physician found that Plaintiff was capable of work at the medium exertional level. The ALJ concluded that Plaintiff was capable of work at a lesser exertional level, a fact that Plaintiff concedes. (DE 11 at 20.) Second, there is no indication that the ALJ played doctor in making her RFC assessment, as it is essentially consistent with the limitations opined by Dr. DeSantis. Specifically, Dr. DeSantis limited Plaintiff to lifting up to fifteen pounds. (R. at 339.) As addressed above, the ALJ limited Plaintiff to light work, relying on VE testimony that Plaintiff could perform the positions of office assistant and parking lot attendant, even if she were limited to lifting fifteen pounds. Dr. DeSantis also opined that Plaintiff required a sit-stand option (R. at 343), which the ALJ included in her RFC (R. at 22). Finally, Dr. DeSantis indicated that Plaintiff should be limited to "minimal bending as tolerated at the waist," (R. at 343), which the ALJ incorporated into the RFC by limiting to Plaintiff to only occasional crouching, crawling, stooping, and bending (R. at 22).

Third, the ALJ appropriately articulated how substantial evidence in the record supported her RFC determination. For example, she points to evidence of normal physical examinations, negative straight leg raise tests, an x-ray of the

25

lumbar spine that only revealed mild listhesis, and a normal EMG.  (R. at 23-24, 371, 576, 581.)  In addition, Dr. DeSantis found Plaintiff to have an "even and normal gait pattern" and that she was "able to walk on her toes and heels symmetrically."  (R. at 361.)  Substantial evidence, therefore, supports the ALJ's RFC and she appropriately articulated her reasoning for the same.

### 3.   Substantial Evidence Supports the ALJ's Consideration of Plaintiff's Report of Side Effects

Plaintiff asserts that the ALJ erred in her consideration of Plaintiff's reports of the side effects of her medication, namely, that they make her very tired during the day.  She argues that the ALJ violated S.S.R. 96-7p by failing to consider the type, dosage, effectiveness, and side effects of Plaintiff's medication.  The Commissioner contends that Plaintiff has failed to demonstrate how the alleged side effects warrant further limitations in her RFC.  Defendant further asserts that the ALJ properly considered Plaintiff's credibility with respect to her subjective reports and concluded that her allegations were not fully credible.

"The ALJ's assessment of credibility is entitled to great weight and deference, since he [or she] had the opportunity to observe the witness's demeanor."  *Infantado v. Astrue,* 263 F. App'x 469, 475 (6th Cir. 2008); *see also Beavers v. Sec'y of Health, Ed., and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) ("The opportunity to observe the demeanor of a witness, evaluating what is said in the light of how it is said, and considering how it fits with the rest of the evidence

26

gathered before the person who is conducting the hearing, is invaluable, and should not be discarded lightly."). Nevertheless, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters v. Comm'r Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters,* 127 F.3d at 531. When assessing an individual's credibility, "the ALJ must [first] determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged." *Calvin v. Comm'r of Soc. Sec.*, 437 F. App'x 370, 371 (6th Cir. 2011). The ALJ made this finding here, concluding that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (R. at 23.)

Upon making such a finding, the ALJ must next "consider the entire case record" to "evaluate the intensity, persistence, and functional limitations of the symptoms considering objective medical evidence." 20 C.F.R. § 404.1529(c)(1-3); S.S.R. 96-7p. A non-exhaustive list of relevant factors to be considered by the ALJ include: 1) the claimant's daily activities; 2) location, duration, frequency, and intensity of pain; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of medication; 5) treatment, other than medication; 6) any measures the claimant uses or has used to relieve his or her pain or other

symptoms; and 7) other factors concerning functional limitations and restrictions. *Curler v. Comm'r of Soc. Sec.*, 561 F. App'x 464, 474 (6th Cir. 2014); 20 C.F.R. § 404.1529(c)(1-3); Soc. Sec. Rul. 96-7p; *see also Ewing v. Astrue*, No. 10-cv-1792, 2011 WL 3843692, at *9 (N.D. Ohio, Aug 12, 2011) ("Social Security Ruling 96-7p requires such factors to be *considered*, not *discussed . . . .*") (emphasis in original) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006)). In his or her opinion, the ALJ must "provide a sufficiently specific explanation for his [or her] credibility determination so that it is clear to the individual and any subsequent reviewers the weight given to the individual's statements and the reasons for that weight." *Malcolm v. Comm'r of Soc. Sec.*, No. 13-15188, 2015 WL 1439711, at *7 (E.D. Mich. Mar. 27, 2015) (citing *Soc. Sec. Rul.* 96-7, 1996 WL 374186, at *1 (July 2, 1997)).

Here, the ALJ notes that Plaintiff "spends most of her time in bed because she takes pain medications, which cause sleepiness." (R. at 23.) Plaintiff is correct that the ALJ does not specifically address those alleged limitations in the remainder of her analysis; however, this is not in error for two reasons. First, the ALJ was only required to *consider* the S.S.R. 96-7P factors, not to explicitly discuss those factors in her decision. *Burbo v. Comm'r of Soc. Sec.*, 877 F.Supp.2d 526, 541 (E.D. Mich. 2012) (citing 20 C.F.R. § 404.1529(c)(3)). Here, the ALJ expressly stated that she complied with S.S.R. 96-7p (R. at 22), and there is no

indication that she failed to do so.  *See, e.g.*, *Malcolm*, 2015 WL 1439711 at *8 (concluding that, in light of the Court's deferential approach to credibility assessments, the ALJ's express statement of compliance was persuasive).

Second, substantial evidence supports the ALJ's treatment of Plaintiff's credibility, and she provided a sufficiently specific explanation of her reasons for doing so.  Notably, the ALJ spent a great deal of time discussing Plaintiff's medical record, which does not contain an opinion by a medical source that supports Plaintiff's allegations of disabling medication side effects.  For example, Dr. DeSantis noted only that Plaintiff's Elavil "makes her very sleepy," and that she was taking "very small amounts" of Motrin, Soma, and Vicodin.  (R. at 701.) In addition, the ALJ pointed out Plaintiff's report to Dr. Vallbhaneni that she was not compliant in taking Naprosyn because it made her sleepy.  (R. at 608.)  Dr. Vallabhaneni, however, noted that Naprosyn "does not cause sedation," and urged Plaintiff to remain compliant.  (R. at 609.)  In contrast, although Plaintiff asserts that the ALJ's credibility assessment was not supported by substantial evidence, she does not point to any evidence in the record (other than her own testimony) which she believes demonstrates that the ALJ erred in her credibility assessment. In other words, other than some subjective complaints of being sleepy, there is no objective evidence that the side-effects of her medications, drowsiness or otherwise, have an adverse effect on her ability to work.  *See Farhat v. Sec'y of*

*Health & Hum. Servs.*, 972 F. 2d 347, at *3 (6th Cir. 1992) (subjective allegations of medication's side-effects, including sleepiness, "must be supported by objective medical evidence."). Accordingly, Plaintiff is not entitled to a remand on this issue.

### G.   CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits. Accordingly, it is **RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary judgment, **GRANT** Defendant's motion for summary judgment, and **AFFIRM** the Commissioner of Social Security's decision.

### III.   PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 932 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of*

*Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987). Pursuant to Local Rule

72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No.

2," *etc.* Any objection must recite precisely the provision of this Report and

Recommendation to which it pertains. Not later than 14 days after service of an

objection, the opposing party may file a concise response proportionate to the

objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich LR

72.1(d). The response must specifically address each issue raised in the objections,

in the same order, and labeled as "Response to Objection No. 1," "Response to

Objection No. 2," *etc.* If the Court determines that any objections are without

merit, it may rule without awaiting the response.


Dated: July 21, 2015                    s/Anthony P. Patti
                                        Anthony P. Patti
                                        UNITED STATES MAGISTRATE JUDGE


I hereby certify that a copy of the foregoing document was sent to parties of record
on July 21, 2015, electronically and/or by U.S. Mail.

                                        s/Michael Williams
                                        Case Manager for the
                                        Honorable Anthony P. Patti

31